The cause stood continued to this term for advisement; and low the opinion of the Court was delivered by
Jackson, J.
The first objection to the plaintiff’s right to recover the contents of the note in question is, that it was given upon an unlawful consideration. In support of this objection, it has been said, that all intercourse with an enemy is unlawful, and that the facts *34 in this case show such an intercourse to have existed in relation to the subject of this contract.
This general proposition cannot be maintained, in the unlimited extent to which it has been carried in the argument for the defendant. Commercial intercourse between two nations at war is understood to be prohibited. This interdiction applies, in general, to any species of commerce by which the enemy may be benefited at the expense of our own country. But the books of the highest authority on the law of nations, and the usages of all civilized people in modern times, abundantly prove that intercourse is not universally prohibited, and that even contracts with an enemy are in some cases allowable.
Grotius, (3) after stating the general principle, that good faith is to be maintained with an enemy, even in contracts made by an individual, says, that it is difficult to define precisely to what extent an individual is authorized thus to contract with the enemy. He finally concludes, that one cannot lawfully sell his goods or valuable effects to an 'enemy, because this will tend to the prejudice of his own country ; but he adds, that, if one makes a contract with the enemy, contrary to his duty to bis own government, he cannot avoid its effect, on the pretence, that he * violated his allegiance in making it; nor on the ground of public policy, unless there be an express law of his country prohibiting such contracts.
Puffendorf (4) seems to adopt the principles of Grotius, without limitation or comment.
Barbeyrac, in his notes on this chapter of Grotius, (5) speaking of the duty of the sovereign to compel his subjects to perform contracts made with an enemy, says, it is to be understood, that they must be such as the sovereign has tacitly approved or allowed.
H. Cocceius, in his commentary on this chapter, maintains the general doctrine of Grotius; and, in noticing the doubts of his author as to the limitation of this right of a private subject to contract with the enemy, says, “ Semper valet pactum, si de suo jure disponunt.” But in another place he seems to consider this right as confined to cases of extremity and necessary self-defence ; as of the ransom of persons or goods, or contributions to preserve a town from destruction or pillage.
S. Cocceius, in his introduction to Grotius, (6) speaking “He fide hosti a privatis data,” divides it into two questions ; “ 1, An subditi, qui non sunt in potestate hostium, pacisci cum hoste de rebus et juribus suis privatis (nam de república pactum nullum est) possunt, et an pacta talia valent ?—2. An captiqucedam promittere hosti possunt, tt an prominentes inde obligentur ?” — As to the first question, he *35 says, in the most general terms, that faith pledged to an enemy must be preserved. But he differs from Grotius, as to the duty óf the sovereign to compel his subject to perform such contract in favor of the enemy ; and says, on the contrary, that the fruits of such a contract may be seized by the sovereign, and confiscated, according to the laws of war. He adds^ that, even when the laws of the country expressly prohibit such contracts, such laws not being obligatory, the contract is not invalidated, but the subject is liable to punishment for having made it in violation of the law.
In the lectures of Heineccius upon Grotius, we find only *a general and brief statement of the opinions of the author, which we have already mentioned. (7)
Vattel, who devotes only one section to this subject, seems to confine the right of entering into a contract with the enemy to cases of great necessity ; as, where one is in the power of the enemy, and cannot be protected by his own government. (8)
.Burlamaqui gives little more than a brief abstract of Grotius. (9) Azuni, in speaking of ransom, states, generally, that every engagement with an enemy is a lawful obligation, and ought to be faithfully observed. (10)
Bynkershoek confines the interdiction of intercourse to such as is commercial in its nature ; at least, his language is thus restricted, and extends only to trade and commerce between belligerents ; (11) and this, it is apprehended, is considered as the law of England. (12)
We need not attempt to reconcile or to vindicate all these different opinions. Many of the authors cited, either expressly or tacitly, confine this right of private subjects to cases of extreme necessity, as, of prisoners, or those whose lives or estates are already in the power of the enemy. But it is sufficient for the present purpose, that not one of them intimates, that all correspondence and intercourse is prohibited between enemies ; and it is believed, that the prohibition is confined, among all civilized nations in modern times, to such intercourse as is commercial. The late government of France did, indeed, for some time, endeavour to exclude their enemy from all correspondence whatever with the people under their dominion ; but this novel attempt was so opposed to all the habits and feelings of the people of Europe, that even the despotic power of that government, it is believed, never could completely enforce it. As to our own government, so far from interdicting all correspondence and intercourse with the enemy, they repeatedly, during the late war, permitted and facilitated such communication, in cartel ships *36 going from * this country to England, and also by distributing, through the medium of the post-office, letters brought by such ships from that country ; taking precautions only to prevent or detect any thing treasonable, or otherwise criminal, in such cor respondence.
By one of the permanent articles of the treaty of 1794, between this country and Great Britain, it was agreed, that no debts due from individuals, nor moneys in the public funds or in banks, should ever, in the event of war between the two countries, be sequestered or confiscated. But, if a merchant of this country, having money due to him in England, could not withdraw it without committing a crime, this would have all the effect of a sequestration of his debt during the continuance of the war. It is clear, he could not go to England, and enforce the payment of his debt in the courts of that country ; nor could he receive the sum due to him in merchandise, and bring it from that country to this. But he might draw a bill of exchange for the amount in favor of a neutral, and, if the English merchant should think proper to pay it, there would be no crime in either party.
There is another article in the same treaty, which is also permanent in its nature, and which may serve to elucidate this subject. It is the ninth article, which provides, that British subjects, who then held lands in this country, should continue to hold them, and should not, so far as respected those lands and the legal remedies incident thereto, be regarded as aliens. Now, in order to fulfil the terms of this article with good faith, it seems necessary, that, if the British owner had leased his lands before the war, he should be allowed to receive the rents, notwithstanding the war. Yet this could hardly be done, without some correspondence between the two countries.
If it be said, that the treaty, in these particulars, introduced a new law, and that it is not evidence of any preexisting rule on this subject, but rather of the contrary ; it may be answered, that the contracting parties, in the * two articles before mentioned, either tacitly recognized the right of intercourse and correspondence between the subjects of the two countries, so far as might be necessary to give full effect to the treaty ; or they conferred the right on their respective subjects ; and in either case, it equally proves the existence of that right during the late war.
It may be added, that, although we resort to writers on the law of nations in the investigation of this subject, still the decision depends altogether upon the municipal law of our own country.
If the Dutch merchants, who, in the war for their independence, asserted the right to trade with their enemy, had been allowed and justified by their government, it would have been thereafter lawful for Dutchmen to carry on even a commercial intercourse with a public enemy; while such intercourse might still have been prohibited to the *37 subjects of England and of France, by their respective governments. The question, therefore, is, whether the laws of Massachusetts, or of the United States, impose any such general restraint or prohibition of all intercourse with the subjects of a public enemy. It cannot be expected, that, during the comparatively short period of our existence as a nation, we should, by tacit consent and common usage, have established for ourselves any new system of principles and rules upon this subject; and it is known, that we have no statute provisions to this effect. When, therefore, we can find no principle, like that contended for in this case, recognized in the English common law, nor any such usage generally established among the other nations of Europe, we may safely infer, that no such rule exists among us.
Dismissing, then, this idea of something mysteriously noxious and criminal in every kind of intercourse with an enemy, we proceed to consider whether the particular contract, upon which the note in question was given, was unlawful, so as to defeat the plaintiff’s right to recover in this action.
* The note was given for the price of a certain document, called a British license, which the plaintiff sold to the defendant, to be used on board his ship, on a voyage to Lisbon, with a cargo of flour ; with an agreement, that the'note should be void, if the ship should be captured and condemned, or prevented from pur suing her said voyage, by the British. The precise tenor of this license does not appear; but we must understand, from the above-mentioned agreement, and from the whole report taken together, that it contained at least a permission, on the part of the British govern ment, or of some British officer, for a ship to proceed, with such a cargo, to Lisbon; or that it contained instructions to British cruisers not to seize or detain the ship.
It has been argued, that, from the nature of the article sold, it was apparent to both parties, that it came originally from the enemy ; that of course, the enemy was ultimately benefited, to the amount of the price or value of the thing ; and, therefore, the sale was substantially for his use, and the whole transaction unlawful ; although the paper might have passed through the hands of many successive owners, before it came to the plaintiff.
This argument would prove too much. Merchandise known to be d the produce, or manufacture of the enemy’s country may be pur chased by a neutral, and sold by him to a citizen of this country, and by the latter again to another citizen. Yet, in this case, the price goes ultimately to the benefit of the enemy, as much as the price of the license does in the case at bar.
It has been said, however, in connexion with this argument, that there is direct evidence in this case, that the plaintiff made this sale as agent, and for the use, of some British subject.
*38 In so far as this suggestion is founded on the testimony stated in the report, that the plaintiff acted in this negotiation as agent for some person unknown, it was an inference of fact, to be left to the jury ; and we must now * presume, if the defendant relied on that point, he submitted it to the jury. We certainly cannot say, on this report, that the verdict in this particular is against the weight of evidence. If it be said, that some such agency, or some improper intercourse between the plaintiff and the enemy, ought to be presumed from the-mere fact of his having possession of such a license, and selling it; it may be answered, that the circumstances of this very case show, that such a presumption would not always be well founded. For, if the defendant, after purchasing this license, had abandoned his intended voyage, and had sold the license to another citizen, the presumption would have been equally strong, that he, the defendant, had been engaged in some unlawful intercourse with the enemy ; or if he had sold it by the intervention of a broker, who should not have disclosed the name of his principal, this argument would prove, that the broker was an agent for the enemy. Yet in both cases, the presumption would be contrary to the fact.
Suppose, however, that it had been proved, on the trial of this cause, that the plaintiff had gone in person to the territory of the enemy, and had there purchased this license, or any other articles of merchandise ; it would not necessarily follow, that he could not recover the price of the articles, if sold by him in this country. The goods would undoubtedly be liable to capture and condemnation as prize; and the plaintiff also might perhaps be subjected to punishment for the misdemeanour. But it is not- easy to see why the defendant, after he had bought the goods, and had used and consumed them, should refuse to pay the price, on account of the offence committed by the plaintiff. This would be to superadd something to the punishment inflicted by the laws for such a crime ; to all which punishment the plaintiff would still remain liable, whether the defendant should pay him his debt or not. It would be virtually to condemn the goods for the benefit of the purchaser (who certainly in such a case would not have a * very meritorious or conscientious claim), when by law they can only be condemned for the benefit of the captor, or of the government, upon a seizure by their officers.
We have still, however, to consider the strongest ground of argument on the part of the defendant. It was said by his counsel, that this license is not to be viewed as a common article of merchandise ; that it contains a kind of contract with the' government of the enemy’s country, or with some of their officers ; and that the use, for which it was intended, when sold, and to which it was accordingly applied, was in violation of the laws of this country.
*39 We may examine these two objections together ; because, if it was not unlawful thus to use the license, the plaintiff might lawfully have it in his possession, and might sell it, and recover the stipulated price. On the other hand, if such use of the license was prohibited by our municipal laws, it seems clear, that the plaintiff was involved in the guilt of the transaction ; inasmuch as the payment of the price was made to depend on the success of this unlawful undertaking ; as there was no deception or misunderstanding as to the facts ; and as the law, which is supposed to have prohibited the act, must be presumed to have been as well known to the plaintiff as to the defendant.
On the argument of this point, it was stated by the counsel, that the question had been settled by the Supreme Court of the United States; and a case was mentioned, in which they had condemned an American vessel, which had sailed under such a license, and was captured on her voyage by one of our cruisers.
It is to be regretted, that we have not had opportunity to see any report of that case, and to ascertain the principles on which the decree was founded. This is peculiarly unfortunate, inasmuch as the decree, being made in a Court of Admiralty, would not of itself be considered as an authority in any Court of Common Law. The only advantage, therefore, which we could derive from the decision, * would be, to learn the opinions of that very respectable court, so far as they might apply to this question of municipal law. Those opinions, indeed, as to any question of common law, would be in a manner extra-judicial ; but they would unquestionably have lightened the labor of our investigation in this case, and would be entitled to great consideration, and have derived much importance from the respect due to the individual members of that court.
It was said, moreover, by the counsel for the plaintiff, that the judges of the Supreme Court were not unanimous in that case.† That fact, if it be so, makes it still more desirable, that we should know the reasons by which the opposite opinions were maintained. When the decision of any court is in itself a binding authority, it is comparatively unimportant to know, whether the opinion was unanimous, or upon what reasons it was founded. But, when the conflicting opinions of learned men are resorted to, having no authority but what is derived from their weight of character, and the arguments by which they support their respective opinions, it is useful to have the opportunity to weigh and consider those arguments.
Since this cause was argued, we have seen a new volume ot “Reports of Cases in the Circuit Court of the United States for the *40 first Circuit” ; in which [page 595] is found the case of The Julia, which vessel, with her cargo, was condemned as prize, for having on board a certain license from a British admiral. This, we presume, is not the case referred to by the defendant’s counsel; although it is said, in a note, that the decree was affirmed by the Supreme Court, expressly for the reasons and upon the principles there stated. The decree in the case of the Julia was founded altogether on the peculiarities of that license, as affording proof of “an illicit intercourse with the enemy, and a direct contract to transport the cargo for the use of the British armies in Spain and Portugal.” There is, indeed, in that report, much argument on the general * question, as to the use of any license from an enemy, and as to the unlawful intercourse with the enemy which is supposed always to attend the procuring of a license ; and the opinion which the Court then entertained on those points is very clearly intimated. Those arguments, however, apply only to the question of prize, which is, indeed, the only' view in .which the point could be presented to that Court; and there may be many cases in which the goods of a neutral, or even of a subject, are justly condemned in a Court of Admiralty, as the property of enemies ; although the owner, if suing m a Court of Common Law, would not be deemed an alien enemy and although his conduct in the particular transaction would noi subject him to any other punishment.
It is further observable, that Valin, who was cited in that case, as supporting the opinion there given, seems rather to be speaking of the municipal law of France than of the general principles recognized among the nations of Europe. The Ordonnance de la Marine, of the year 1681, Lib. 3, Tit. 9, Art. 5, provides, that “every ship, fighting under any other flag than that of the state by which she is commissioned, or having commissions from two different princes or states, shall be good prize.” About twenty years afterwards, some doubts having arisen in France, whether this article applied to French ships, and subjected them to condemnation, Louis XIV., in a letter to the Count of Toulouse, declares his intention, that the ships of his subjects should never sail under any other flag than that of France ; † and that all ships, which should be found transgressing this law, should be condemned as prize. In the same letter he gives some directions as to the treatment of the ships of enemies, sailing under French passports, and which might be found with two sets of bills of lading, the one indicating a destination for a French port, and the * other for a port of the enemy ; and he leaves it *41 to the courts or officers to ascertain, under all circumstances, whether the true destination was for France, and to condemn or restore them accordingly. It is on this letter, as an interpretation of the fifth article, that Valin is commenting, (13) when he says, 1st, that the circumstance of two permits, passports, or bills of lading, one from France and the other from the enemy’s country, is not alone a sufficient cause for condemning an enemy’s ship ; and 2dly, that this article (that is, the fifth article before mentioned, which prohibits the use of two commissions) applies to French ships, as well as to those of strangers.
Here it is observable, that the Ordonnance (which is understood to be, in general, a compilation of prize law, as recognized among civilized nations) provides, generally, that every ship, having two commissions, may be seized by French cruisers, and condemned as prize. This is founded on the law of nations, as understood in France ; and probably every other civilized nation would agree with them in this particular.
But the question, whether that article of the Ordonnance applied to French ships, and subjected them to condemnation in the courts of France, was obviously a question of municipal law. If the King of France had thought proper, in his letter, to give a different interpretation to that article, and. to have exempted French ships from its operation, his edict to that effect would have constituted the law of France; no other nation would have been at all concerned in the question ; and his ships might have sailed with two or more commissions, without any danger of condemnation in his courts. In whichever way he should have determined that question, it would still only have settled the law of France on that subject; and would have served as a rule to his own courts, with respect to the treatment of his own ships.
The other part of this letter, on which Valin is commenting in the place cited, relates only to the trade * carried on by an enemy under a French passport or license ; and the object of it is, to prevent the fraudulent use of such licenses by the enemy, for the purpose of protecting their own trade, and avoid ing capture by the French. There seems to be no reference, in this part of the letter, to the case of a French ship’s sailing under a license from the enemy.
We, then, return to the consideration of this argument of the defendant’s counsel, upon the principle of our own municipal laws. It is to be observed, in the first place, that the voyage, on which this vessel sailed, was lawful in itself. Any citizen of this country, if he was willing to incur the risk of capture by the enemy, might have *42 carried a cargo of provisions to Lisbon. There can be no doubt, that, if he had carried it, upon any contract with the British government, for the supply of their fleets and armies, the voyage would have been unlawful. But there has been no suggestion, that there was any such contract, or any such intention in this case, unless it must be necessarily inferred from the fact of sailing with this license.
The question, then, as it presents itself to our minds, is, whether a voyage, which is permitted by our laws to the citizens of this country, is rendered unlawful, because the enemy also thinks proper to permit it ; or, because he declares his intention not to seize or detain vessels employed in that particular trade. We state the question in this general manner, because there is no evidence of the mode in which this license was originally procured from the enemy ; and wre are not to presume, without evidence, that it was procured by any treasonable or criminal intercourse ; and because there appears to have been nothing peculiar in the terms of the license ; nothing like a personal indulgence to any individual, in consideration of services rendered or promised to the enemy ; but it seems to have been for sale in the market, for the use of any ship, whose owner should think proper to purchase it.
Let us suppose, then, that it was the known practice ot * the British government, not to detain the vessels of their enemy, when sailing on certain particular voyages ; as, for example, on voyages of discovery, or for purposes merely scientific, or on fishing or coasting voyages; it would not, surely, he unlawful for an American citizen to sail on such a voyage, relying on that known practice and usage for his protection, † So, if, in all their wars, for a long course of years, they had been accustomed, by proclamation, to exempt from capture or detention by their cruisers certain descriptions of vessels or voyages ; upon a like proclamation, in the late war, any citizen might lawfully have undertaken such a voyage, if it were in other respects conformable to our laws.
If such a case had never occurred before, there would have been nothing more criminal in relying on such a proclamation, made for the first time in this war. The only difference would have been, that their enemies would not, probably, have relied with so much confidence on their assurances of safety and protection.
If, during the late war, the British government had issued a proclamation, setting forth the struggle for liberty and national independence, in which the people of Spain and Portugal were then engaged, and the consequent scarcity of provisions in those countries, arising from the interruption of the cultivation of their lands, and from the *43 increased consumption by the numerous hostile armies ; and announcing their intention, for those reasons, not to detain or molest any vessel, bound with a cargo of provisions to Spain or Portugal; some men might distrust these assurances ; but there would be no crime in confiding in them, and undertaking a voyage accordingly. It would belong to our government to decide, whether this regard for the in • terests of the Spaniards and Portuguese was not a mere pretence on the part of the British government, and whether the measure was not adopted exclusively for their own * advantage ; and, if it should so appear to our government, they might interdict the trade altogether. But, if they should not interdict it, it might, in such a casé, be carried on by any citizen of this country, consistently with the purest patriotism, and the most enlightened regard to the interest of the United States.
It is said, however, in the case now under consideration, that there was a direct communication with the enemy ; and that the parties concerned in the voyage in question did not rely merely on a general declaration or promise, but on a particular contract with the enemy ; by which they would be bound, or at least induced, to further his views, to the prejudice of their own country.
We have before observed, that, where any such contract or engagement is proved to have existed, it renders the voyage unlawful. But the question returns, whether the mere possession of this license is evidence of such unlawful contract. Suppose that a citizen of the United States, without having seen any proclamation, or license of any kind, from the enemy, should be satisfied, on inquiry, that they would not interrupt the trade between this country and Spain ; the information thus obtained would not render his voyage unlawful. Such information might be obtained from conversation with a British officer, a prisoner of war here ; or through a neutral, or an American prisoner of war at Halifax; and, if the latter was at some expense in procuring an interview with the British officers, it would be just and reasonable, that the merchant here, at whose request he did it, should reimburse that expense. We may go a step further, and suppose that the British commander at Halifax, in order to prevent such repeated personal applications, should write a letter to some third person, declaring the intentions of his government in respect to this trade ; to be exhibited to any one who should be interested in making the inquiry. It would certainly be no offence against our laws, if an American merchant should procure a copy of that letter, and put it * on board his ship, in order to prevent any interruption to his voyage by British cruisers.
We are to understand, that the sole object of the American met chant, in all these cases, is, to ascertain what course of conduct tha British government have determined to pursue ; not to bribe, or *44 otherwise induce, their officers to grant a special favor to himself; and, still less, to stipulate for any thing to be done on his part, contrary to his allegiance and duty to his own country. This is the true ground of distinction between the conduct which is prohibited, and that which is allowed, in this respect, by our laws ; and much of the difference of opinion, which has existed on this subject, may perhaps be attributed to a disregard or inattention to this distinction.
In the case of the Julia, for example, there was evidence, which satisfied the Court, of a direct contract to transport the cargo for the use of the British armies. No one could doubt, upon that state of facts, that the voyage was unlawful. On the other hand, if a merchant, whose vessel was bound to Spain, had purchased a London gazette, containing an order in council permitting that trade, and had sent this gazette in his vessel, instead of taking one of our newspapers in which the same order was printed, it would never be imagined that he had committed any offence against our laws.
Before quitting this subject, we may state one other mode, in which such licenses might have been lawfully obtained by an American citizen ; which, like some of the preceding, is suggested by the opinions at that time entertained by some persons, as to the real cause and mode of issuing those licenses. Suppose the people of Spain had represented to the British government, that they were exposed to great distress from the want of provisions ; and that the British government, at their request, had agreed, that all ships, bound to their ports with provisions, should pass unmolested, and had delivered to them passports or licenses for that purpose, to be used by all ships that should * sail on such a voyage ; would it be doubted, that any American might lawfully take out one of those passports from the Spanish government, and use it for his protection on such a voyage ? If the government of Spain should have made those licenses an article of traffic, and should have demanded a high price for the sale of them, their own subjects, the consumers of the provisions, would have ultimately paid for this increased expense of the voyage ; and, if they did not pay enough for that purpose, the trade would necessarily cease. If, on the other hand, the British government, forgetting their pretensions to magnanimity and to an exclusive regard to the welfare of their allies, should exact a high price for those licenses, and attempt to derive a revenue from them ; it would be the duty of our government to prohibit the trade, as soon as it appeared, that the advantage, derived from it to our country, was overbalanced by this revenue accruing to our enemy.
In the present case, we are not informed what was precisely the tenor of the license sold by the plaintiff to the defendant; and we have no reason to believe, and are not authorized to presume, that it *45 differed materially from many others which were mentioned on the trial; nor that it was granted upon any particular contract between the defendant and the enemy. If it contained any thing of a peculiarly noxious character, which would have affected the result of this trial, it is the misfortune of the defendant, that he was not able to produce the paper ; but we cannot supply the want of that evidence.
The view which we take of this case, and the grounds of the opinion which we have formed in it, may be summed up in few words. The voyage in question was lawful in itself, and might have been undertaken without a British passport or license, by any merchant of the United States who was willing to incur the risk of capture by the enemy. The license was only an indication' of the intention of the British government not to interrupt that trade; * and might serve as satisfactory evidence on that point to any British officer, who should not have received such orders directly from his own government, so as to prevent any temporary detention of the ship and delay of the voyage. There is no evidence of any unlawful intercourse with the enemy in procuring the license ; and there are many different modes in which it might have come lawfully to the hands of the plaintiff. The purchase and use of the license by the defendant, under these circumstances, was not an immoral act; nor was it prohibited by any law of this country. The sale, therefore, by the plaintiff was a lawful transaction ; and the defendant is bound to pay the stipulated price.
In confirmation of the opinion which we have expressed, we may refer to two Acts of Congress, which seem clearly to prove what was the understanding of the government of the United States Upon the subject which we have been considering. The first was passed on the 6th of July, 1812, (14) by which all citizens and persons residing in the United States are prohibited from receiving or obtaining a license from the government of Great Britain, or any officer thereof, “ for leave to carry any merchandise, or any vessel, into any port or place within the dominions of (Great Britain, or to trade with any such port or place.” This seems strongly to imply that the use of such a license for trade with a neutral country was unobjectionable. In the course of the year following, the government probably had ascertained or believed that our trade, even with neutrals, under such licenses, was, on the whole, prejudicial to this country ; and they accordingly passed the Act of August 2d, 1813, (15) by which all citizens and inhabitants of the United States are prohibited from obtaining or using, directly or indirectly, any license, pass, or other like instrument, granted by the" British government, or by any officer thereof, for the protection of a ship in any place, or for its admission *46 into any port whatever ; and all American ships, found with such licenses, * are to be considered as sailing under the British flag, and are made liable to capture and condemnation. The only punishment, inflicted by force of this Act, for obtaining or us ng such a license, is a pecuniary forfeiture and fine ; the amount of which is limited by the Act; whereas, if it had been previously an offence at the Common Law, the guilty party would be liable to imprisonment and to a fine, to be limited only by the discretion of the Court. The Act, therefore, must be understood as describing and creating a new offence, and not as inflicting additional penalties for an offence previously known and punished by our laws.

Judgment according to the verdict.

[See 1 Phil, on Ins. 34, and case there cited.— Ed.]
No writ of error lies to the court of a State, unless the record of the suit shows the matter upon which the party relies for a reversal of the judgment. Neither the report of the judge of the proceedings at the trial, nor the reasons given for the opinion of the Court, nor the papers and documents filed in the case, are a part of the record.
After this judgment was entered, the counsel for the defendant suggested, that it was his desire and intention to prosecute a writ of error in the Supreme Court of the United States, for the purpose of having the said judgment reversed ; and they stated, as the ground of the motion, that it appeared, by the record and process in the suit, that the construction of a certain statute of the United States, made and passed on the 18th day of June, 1812, declaring that war existed between the said United States and the King of the United Kingdom of Great Britain and Ireland, and also the construction of the eighth section of the first article of the Constitution of the United States, were drawn in question in the suit aforesaid ; and that the decision was against the title, right, privilege, and exemption, specially set up and claimed by the defendant, under the said statute and the said article of the Constitution. And they moved, thereupon, that such writ of error, a copy being lodged for the adverse party in the clerk’s office, might be a supersedeas and stay of execution in the action ; and prayed that a citation might be issued, &c., and offered security, &c.

Curia.

There is no pretence for supporting this motion. There is nothing upon the record which will * justify it.
If a defendant wishes to avail himself of any statute of the United States, and intends eventually to resort to the Supreme Court, of the United States for a decision, he must plead the matter upon which he relies ; or, if a question of that sort incidentally arises, he *47 must obtain a positive opinion of the judge upon it, and then file his bill of exceptions in the ordinary form. The report of the judge is not a part of the record ; nor are the reasons given for the final opinion of the Court; nor the papers and documents filed in the case.
All that the record of this case will show is, that the suit was Detween two citizens of this State, upon a promise to pay a sum oí money ; that the defendant denied the promise ; and that there was a verdict of the jury against him, and a judgment on the verdict.
The defendant did not specially set up any title, right, privilege, or exemption, in his defence ; and, therefore, has not brought himself within the law of the United States providing for a writ of error. (1)
JViotion overruled.†

 De Jure Bel. & Pac. Lib. 3, c. 28.

 Lib. 8, C. 7.

 § 10.

 Diss. prœmilis 12, Lib. 7, c. 6, § 4.

 Pralectiones in H. Grot. &c. Lib. 3, c. 23.

 Lib. 3, c. 16, § 264.

 Part 4, c. 13.

 Part 2, c. 4, Art. 6.

 Quast. Juris Publici) 1, c. 3.

 Chitty on the Law of Nations, chap. 1

 The fact does not appear in Mr. Wheaton's report of the case.

 Vide also Art. 3, of the same book and title; by which the subjects of France are expressly forbidden to take a commission for an armed vessel from any foreign prince, or to sail under his flag, without the permission of the King of France-9 under the •»enaltj of being, treated as pirates.

 Vol. 2, page 241.

 See more examples of this kind of relaxation among different nations in Byni Quast. J. Pub. c. 3

 U. S. Laws, vol. 11, page 309

 U. S. Laws, vol. 12, page 225.

 Stat. 1. Cong. 1. Sess. c. 20, § 35.

 Vide 6 Mass. Rep 323