HENSEL, BRUCKMANN & LORBACHER, INC. *v.* UNITED STATES

**No. 5909.**—Invoices dated Krefeld, Germany, September 1, 1936, etc.
Entered at New York, N. Y., September 17, 1936, etc.
Entry No. 736013, etc.

(Decided August 3, 1943)

*Puckhafer, Rode & Rode* (*John D. Rode* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the defendant.

TILSON, Judge: The appeals to reappraisement listed in schedules A and B hereto attached and made a part hereof, involve the question of the dutiable value of certain imported steel tubing from Germany. The merchandise was appraised on the basis of United States value and is claimed to be dutiable on the basis of cost of production under section 402 (f) of the act of 1930.

In each of the appeals there was filed that which is commonly known as a duress certificate under the provisions of section 503 (b) of said act, in which the plaintiff certified that he had entered the merchandise at a value higher than the value defined in this act because of advances by the appraiser in similar cases then pending on appeal for reappraisement.

The litigation over the question here presented has been considerable, the original decision of the trial judge being rendered on January 4, 1938, Reap. Dec. 4209. From this decision an appeal was filed to the Third Divison, and on August 9, 1938, the judgment was reversed, Reap. Dec. 4376. Whereupon a motion for rehearing was filed and thereafter granted, Reap. Dec. 4440. On February 15, 1939, the appellate division remanded the cases to the trial court for a retrial, Reap. Dec. 4523. Up to this stage the plaintiff had not attacked the United States value as the proper basis for appraisement, but had merely contended for a lower United States value than that found by the appraiser. However, when the case was again called before the

trial court, counsel for the plaintiff made the contention that United States value was not the proper basis for appraisement and offered evidence tending to establish cost of production.

On February 13, 1940, the trial court rendered a decision in favor of the plaintiff, holding the cost of production to be the proper basis of appraisement, Reap Dec. 4728. From this decision an appeal was filed before the Third Division, and on March 11, 1941, the division rendered a decision affirming the decision of the trial court, Reap. Dec. 5161. From this decision no appeal was filed, so that the final decision in the test case of the appellate division of this court held the cost of production to be the proper basis for appraisement. The parties, the merchandise, and the issue in this case are the same as in the original test case, finally decided in Reap. Dec. 5161.

The original hearing in this case was held before Judge Kincheloe, a later and second hearing was held before Judge Lawrence, and after Judge Lawrence disqualified himself, the case was assigned to the writer of this opinion, before whom, after a hearing, the case was submitted. At the trial before Judge Kincheloe, counsel for the plaintiff moved to consolidate all these 134 appeals for the purpose of trial and decision, to which motion the Government objected and assigned various reasons therefor, none of which do I consider sufficient upon which to deny the motion. Just what advantage or benefit would be gained by anyone by having 134 separate trials or even two separate trials, or how it would work to the injury or hardship of anyone to consolidate the cases and try them all together, is not pointed out by counsel for the defendant. This motion, tentatively granted by the trial judge for the purpose of taking certain testimony, was renewed before me and granted.

At the original trial counsel for the plaintiff also moved the incorporation herein of the record in the test case, finally decided and reported as Reap. Dec. 5161, to which counsel for the defendant objected upon various grounds, principally upon the ground that the export period of 114 of the instant appeals was subsequent to the period covered by an affidavit in the original case. Rule 23 of this court provides, in part, that:

When a case is under consideration which involves questions of law and fact substantially the same in character as were involved in another case which has been previously decided, or tried and submitted to the court for decision, the record, or any part thereof, in such previous case may, within the discretion of the court, be admitted in evidence in the pending case upon motion of either party: * * *.

Being satisfied that the facts bring this case squarely within the above-quoted rule, upon the motion being renewed at the trial before me, the same was granted, and the record in the test case, reported as Reap. Dec. 5161, was admitted in evidence as a part of the record in this case.

Counsel for the defendant moved the court to suspend or continue these cases for the duration of the present conflict between the United States and Germany under the Trading with the Enemy Act, and cited certain authorities which she contended supported the motion. This motion was based upon the assertion that the importer was an alien enemy, or that he was the agent of the enemy. As supporting this contention counsel for the defendant calls attention to the fact that all the invoices before the court are prepared on the consignment form of invoice, and argues from that that the plaintiff is clearly the agent of the enemy.

As against this contention of counsel for the defendant, we have the statement of counsel for the plaintiff, undenied and unchallenged by counsel for the defendant, that the form of invoice being used by this plaintiff was the subject of a ruling by the Treasury Department, and that after investigation of the relationship between the importer and exporter, by its agents, the plaintiff was required to change his invoice to the regular purchase form of invoice. It should be remembered that the relationship existing between two parties is a matter of proof and is not controlled or determined by the color of an invoice. The most that can be said regarding the color or form of an invoice is that it may be suggestive of the relationship between two parties.

In this connection the importer testified that he had continuously been a resident of the United States since October 1 or 2, 1910, and that he was a citizen of the United States, and in response to the question: "Did you file these appeals to reappraisement in your own right, or did you file them as agent for a shipper?," the witness answered: "I filed them in my own right." The witness further testified that all the refunds received by reason of the decision in the test case belonged to him, that he kept it and paid income tax on it, but he also frankly admitted that the exporter might have an interest in any refunds which might be received by him by reason of a favorable decision in this case, and produced a copy of a form he had filed with the Federal Reserve Bank of New York showing "Anything that I might owe, or do owe to this firm in Germany." "This covers everything before the court now and everything I owed them, or might owe them." Referring to the form the witness filed with the Federal Reserve bank, the witness testified further:

Examiners have been in my office at various times and looked at that, and looked at the bank accounts, and money which I owe to this firm is kept in a separate frozen account, frozen by me." * * *. "And frozen by the bank so that it cannot be touched, subject to the disposal of the Treasury Department or the Enemy Alien Public Custodian."

Since the record shows that the importer of record is a resident and a citizen of the United States, he is certainly not an alien enemy, and the appeals are therefore not subject to be suspended or con-

tinued for the duration of the present conflict upon that ground. There is no evidence before me to show that the plaintiff herein is at the present time trading with the enemy, and the fact that an American citizen was in the years 1935 to 1939, inclusive, the sole sales representative of a firm of German exporters would not be a sufficient reason for suspending or continuing these appeals for the duration of the present conflict, under the Trading with the Enemy Act, Public Law No. 91, 65th Congress, Oct. 6, 1917, 40 Stat. 411, as amended.

The record fails to show that the importer herein has at the present time, or that he has, at any time in the past, at least since 1910 or thereabout, had any connection with any German subject other than that of acting as the sole and exclusive sales representative in the United States of the German exporter. This is far from being the agent of an alien enemy for the purpose of bringing and maintaining a suit in the courts of the United States. The decision of the Supreme Court of the United States in *Hanger* v. *Abbott*, 6 Wall. 532, 18 L. Ed. 939, would appear to be ample authority for holding that any sales agency relationship which might have existed between the importer herein and the German exporter was automatically canceled upon the declaration of a state of war between the United States and Germany. In that case Mr. Justice Clifford stated:

Partnership with a foreigner is dissolved by the same event which makes him an alien enemy, because there is in that case an utter incompatability created by operation of law between the partners as to their respective rights, duties, and obligations, both public and private, which necessarily dissolves the relation, independent of the will or acts of the parties.

\*     \*     \*     \*     \*     \*      \*

Executory contracts also with an alien enemy, or even with a neutral, if they cannot be performed except in the way of commercial intercourse with the enemy, are dissolved by the declaration of war, which operates for that purpose with a force equivalent to an act of Congress. *Exposito* v. *Bowden*, 4 El. & Bl. 963, 7 El. & Bl. 778.

Therefore, under the above-quoted authority, any contract of agency which might have existed between the importer and exporter herein during the years 1934 to 1939, inclusive, was dissolved by the declaration of war between the United States and Germany as effectively as if such contract had been dissolved by an act of Congress. Such being the case, it cannot be seriously contended that the importer herein is today an agent of an alien enemy, and thereby barred from our courts by the Trading with the Enemy Act.

Counsel for the defendant admitted that the plaintiff herein might be the sole agent of the shipper in this country and still not be within the Trading with the Enemy Act.

But even if it should be held that the importer herein is an agent of the exporter, who, under the law, is an enemy, I am unable to see why he should be barred from prosecuting this action at this time, under the recent authorities on the subject. The sole intent and purpose of the Trading with the Enemy Act is to prevent aid and comfort being given to our enemy, as well as to avoid hampering our own war efforts. Should the plaintiff herein be successful in this litigation, and by reason thereof obtain refunds or any sum of money, how are such funds or refunds going to render aid or comfort to our enemy, or hamper our own war effort in any way when it is a physical impossibility to transfer one penny of such money to the enemy? The evidence in this case is that even before any favorable judgment is obtained the interest, if any, of the exporter to any and all moneys which might be received by the importer herein by reason of such judgment, have been definitely frozen. This means, of course, that during the present conflict, not one penny of such refunds can come into the possession of the enemy.

In the recent case of *Ex parte Kawato*, decided November 9, 1942 (317 U. S. 69), the Supreme Court of the United States made the following observations:

\* \* \*. Even if petitioner were a non-resident enemy alien, it might be more appropriate to release the amount of his claim to the Alien Property Custodian rather than to the claimants; and this is precisely what was done in *Birge-Forbes Co.* v. *Heye*, 251 U. S. 317, 323, in which this Court said that the sole objection to giving judgment for an alien enemy "goes only so far as it would give aid and comfort to the other side." The ancient rule against suits by resident alien enemies has survived only so far as necessary to prevent use of the courts to accomplish a purpose which might hamper our own war efforts or give aid to the enemy. This may be taken as the sound principle of the common law today.

\* \* \* \* \* \* \*

\* \* \*. Harshness towards immigrants was inconsistent with that national knowledge, present then as now, of the contributions made in peace and war by the millions of immigrants who have learned to love the country of their adoption more than the country of their birth. Hence in 1813 Chief Justice Kent, in *Clarke* v. *Morey*, 10 Johns. 69, 72, set the legal pattern which, with sporadic exceptions, has since been followed. The core of that decision he put in these words: "A lawful residence implies protection, and a capacity to sue and be sued. A contrary doctrine would be repugnant to sound policy, no less than to justice and humanity." Thus the courts aligned their policy with that enjoined upon the President by Congress in 1812, when it directed him to administer the laws controlling aliens in a manner that would be "consistent with the public safety, and according to the dictates of humanity and national hospitality."

In the *Birge-Forbes* case, *supra*, Mr. Justice Holmes, speaking for the Supreme Court of the United States, said:

There is nothing 'mysteriously noxious' (*Coolidge* v. *Inglee*, 13 Mass. 26, 37) in a judgment for an alien enemy. Objection to it in these days goes only so far as it would give aid and comfort to the other side.

In the case of *Drewey* v. *Onassis*, N. Y. Law Journal, November 19, 1942, Mr. Justice Collins, said:

I cannot perceive that the prosecution of this action to judgment would or could aid or comfort the enemy. On the contrary, our sinews of war might be appreciably augmented thereby. The mischief lurks not in the prosecution of the action to judgment, but in the possible use to which the avails of the judgment might be put. Control the avails and you avert the mischief.

Executive Order No. 8389, as amended, dated June 14, 1941, provides in part as follows:

Section 1. All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses, or otherwise, if (i) such transactions are by, or on behalf of, or pursuant to the direction of any foreign country designated in this Order, or any national thereof, or (ii) such transactions involve property in which any foreign country designated in this Order, or any national thereof, has at any time on or since the effective date of this Order had any interest of any nature whatsoever, direct or indirect:

A. All transfers of credit between any banking institutions within the United States; and all transfers of credit between any banking institution within the United States and any banking institution outside the United States (including any principal, agent, home office, branch, or correspondent outside the United States, of a banking institution within the United States);

B. All payments by or to any banking institution within the United States;

C. All transactions in foreign exchange by any person within the United States;

D. The export or withdrawal from the United States, or the earmarking of gold or silver coin or bullion or currency by any person within the United States;

E. All transfers, withdrawals or exportations of, or dealings in, any evidences of indebtedness or evidences of ownership of property by any person within the United States; and

F. Any transaction for the purpose or which has the effect of evading or avoiding the foregoing prohibitions.

It will thus be seen that the Secretary of the Treasury is charged with the duty and responsibility of issuing all proper and necessary regulations, rulings, instructions, or licenses to prevent any funds or avails by reason of a judgment in the courts of the United States or otherwise, from falling into the hands of our enemy. This effective means of control will most certainly prevent any funds or refunds which may be awarded by a judgment for the plaintiff in this case from being used to aid or comfort the enemy, and I fail to perceive how such award can hamper or hinder our own war effort.

Under the law the only function I have to perform in this case is find the proper dutiable value for the merchandise. If, based upon such judgment, any refund is due to the plaintiff herein, the collector of customs, who is under the direct supervision and control of the Secretary of the Treasury, makes payment of such refund. I, therefore, find and hold that it is not necessary or desirable to suspend or

continue these cases *pendente bello,* and the motion to that end is hereby denied.

Turning now to the merits of this case, I am quite willing to rest my decision upon the decision of the appellate division Reap. Dec. 5161, wherein it was held that cost of production was the proper basis for appraisement, but counsel for the defendant insists that the affidavit of cost of production upon which the decision in the test case was based, is not sufficient upon which to base a judgment in this case for the reason that said affidavit covers a period just prior to November 1935, and the export period covered by the present appeals extends from 1936 through the first part of 1939. It is to be noted, however, that the decision of the appellate division covered exportations as late as March 1937. There is also contained in the affidavit of cost of production the following statement:

The above costs would ordinarily make possible the manufacture and production in the usual course of business of all of the shipments of tubes made after Nov. 1, 1935 to Alex Benecke, New York, American Cutting Alloys, Inc., New York, and Hensel, Bruckmann & Lorbacher, Inc., New York.

In addition, the invoices and entries covered by these 134 appeals show that the merchandise was invoiced and entered at the identical or substantially identical, values as was the merchandise in the test case, covered by Reap. Dec. 5161, and that in each case the merchandise was appraised as entered. True, the merchandise was appraised on the basis of United States value, while in the test case it was held to be dutiable on the basis of cost of production. In my opinion this circumstance is not here material. The official records before me show that from 1934 through 1939 this merchandise was invoiced, entered, and appraised at the same or approximately the same value, and this, in my judgment, is sufficient to show a steady market or value for this merchandise for such period, as against the argument of counsel for the defendant that the market value increased or decreased, due to the present war.

Counsel for the defendant first strenuously argued that this court should take judicial notice of the fact that the value of this merchandise increased due to the rush to build armaments, but when it was suggested by the trial judge that due to Government control and subsidies in Germany the value might have decreased, counsel for the defendant then contended this court should take judicial notice of the fact that the value of the merchandise either *increased* or *decreased.* The fact remains however that the invoiced price, as well as the entered and appraised values remained constant during this entire period from 1934 through the first part of 1939.

Upon a full consideration of the entire record I find that the proper basis of appraisement of the merchandise covered by the appeals

listed in said schedule A is the cost of production as defined in section 402 (f) of the act of 1930, and that such cost of production is as follows:

| | Black or Unturned Tubing. Reichsmarks per 100 kilos | Turned Tubing Reichsmarks per 100 kilos |
|---|---|---|
| Cost of material | 12. 00 | 12. 00 |
| Cost of labor | 9. 80 | 11. 65 |
| General expenses | 2. 65 | 2. 85 |
| Cost of making merchandise ready for shipment to U. S | 1. 00 | 1. 00 |
| Profit | 2. 45 | 2. 65 |
| Total | 27. 90 | 30. 15 |

As to the merchandise covered by the appeals listed in said schedule B, the affidavit of the cost of production was dated May 3, 1939, and does not purport to cover, nor could it be construed to cover any shipments subsequent to that date. There is therefore no evidence before me to overcome the values found by the appraiser, which values as to said appeals are hereby found to be the proper dutiable values for said merchandise. Judgment will be rendered accordingly.