### Thomas Kershaw *vs.* Albert H. Kelsey.

A lease of a plantation in a state within the rebel territory during the civil war, made within that state by a citizen and resident thereof to a citizen of this Commonwealth being there, at a rent payable and paid in part in cash on taking possession of the plantation, and the rest payable out of the cotton crop to be raised thereon; and by which the lessor agreed to deliver, and the lessee to receive and pay for, corn then on the plantation, and which was immediately delivered accordingly, and used thereon; was not prohibited by the law of nations, or by the act of congress of 1861, *c.* 3, § 5, and the proclamations issued by the President under that act. And in the absence of any objection to the lessor's capacity to sue, he may maintain an action in this court to recover the unpaid instalment of the rent and the value of the corn.

Gray, J.   The defendant, a citizen of Massachusetts, in February 1864, in Mississippi, took from the plaintiff, then and ever since a citizen and resident of Mississippi, a lease for one year of a cotton plantation in that state, and therein agreed to pay a rent of ten thousand dollars, half in cash, and half " out of the first part of the cotton crop, which is to be fitted for market in reasonable time."   The lessor also agreed to deliver, and the lessee to receive and pay the value of, the corn then on the plantation.   It does not appear whether the defendant went into Mississippi before or after the beginning of the war of the rebellion ; and there is no evidence of any intent on the part of either party to violate or evade the laws, or oppose or injure the government of the United States.   The defendant paid the first instalment of rent, took possession of the plantation and corn, used the corn on the plantation, provided it with supplies to the amount of about five thousand dollars, and planted and sowed it, but early in March was driven away by rebel soldiers, and never returned to the plantation, except once in April for

owing, after which he came back to Massachusetts. The plaintiff continued to reside on the plantation, raised a crop of cotton there, and delivered it in Mississippi to the defendant's son, by whom it was forwarded in the autumn of the same year to the defendant; and he sold it and retained the profits, amounting to nearly ten thousand dollars.

The plaintiff sues for the unpaid instalment of rent, and the value of the corn. The claims made in the other counts of the declaration have been negatived by the special findings of the jury.

The defendant, in his answer, denied all the plaintiff's allegations; and at the trial contended that the lease, having been made during the civil war, was illegal and void, as well by the principles of international law, as by the terms of the act of congress of 1861, c. 3, § 5, and the proclamations issued by the President under that act, declaring " all commercial intercourse by and between " the State of Mississippi and other states in which the insurrection existed " and the citizens thereof, and the citizens of the rest of the United States," to be unlawful, so long as such condition of hostility should continue, and that " all goods and chattels, wares and merchandise," coming from such states into other parts of the United States, or proceeding to such states by land or water, together with the vessel or vehicle conveying them, or conveying persons to or from such states, without the license of the President, should be forfeited to the United States. 12 U. S. Sts. at Large, 257, 1262. 13 Ib. 731.

The judge presiding at the trial ruled that the contracts sued on were legal, and the jury having returned a verdict for the plaintiff, the question of the correctness of this ruling is reported for our decision ; the parties agreeing that, if the ruling was correct, the case shall be sent to an assessor; but if incorrect, judgment shall be entered for the defendant.

This case presents a very interesting question, requiring for its decision a consideration of fundamental principles of international law. It is universally admitted that the law of nations prohibits all commercial intercourse between belligerents

**without** a license from the sovereign. Some *dicta* of eminent judges and learned commentators would extend this prohibition to all contracts whatever. In a matter of such grave importance, the safest way of arriving at a right result will be to examine with care the principal adjudications upon the subject, most of which were cited in the argument.

The celebrated judgment of Sir William Scott, in the leading case of *The Hoop*, 1 C. Rob. 196, determined only that all trading with a public enemy, unless by permission of the sovereign, was interdicted; and that all property engaged in such trade was lawful prize of war. None of the numerous authorities there cited went beyond this. The principal reason assigned is, that in a state of war the question when and under what regulations commercial intercourse, which is a partial suspension of the war, shall be permitted, must be determined, on views of public policy, by the sovereign, who alone has the power of declaring war and peace; and not by individuals, upon their own notions of convenience, and possibly on grounds of private advantage, not reconcilable with the general interest of the state. In the case of *The Indian Chief*, 3 C. Rob. 22, the same principle was applied to the case of a foreign merchant resident in the British possessions in India. And all the later cases in the same court were of trading or licenses to trade with the enemy, directly or indirectly.

It is true that, in the case of *The Hoop*, that eminent jurist does also somewhat rely upon the consideration of the total inability to enforce any contract by an appeal to the tribunals of the one country on the part of the subjects of the other. The rule is certainly well settled that during any war, foreign or civil, an action cannot be prosecuted by an enemy, residing in the enemy's territory, but must be stayed until the return of peace, or, in the words of the old books, *donec terræ sint communes.* Staunf. Prerog. fol. 39. Co. Lit. 129 *b.* *Sanderson* v. *Morgan,* 39 N. Y. 231. *Wheelan* v. *Cook*, 29 Maryl. 1. But that rule temporarily restrains the remedy only, without denying or impairing the existence of the right; as was said by the supreme court of New York, while Chancellor Kent presided there, " The

present plea only bars the plaintiff, in his character of alien enemy commorant abroad, from prosecuting the suit; it does not so much as touch the merits of the action." *Bell* v. *Chapman*, 10 Johns. 185. That it has nothing to do with the validity of the contract sued upon is manifest from the case of a ransom bill, which is universally admitted to be a lawful contract, and yet upon which no action can be maintained in a court of common law during the war, but may after the return of peace. *Ricord* v. *Bettenham*, 3 Burr. 1734; *S. C.* 1 W. Bl. 563. *Anthon* v. *Fisher*, 2 Doug. 650; *S. C.* 3 Doug. 178. *Brandon* v. *Nesbitt*, 6 T. R. 28. 1 Kent Com. (6th ed.) 107. The reasons assigned by common law judges for the plea of alien enemy are, that an enemy to our government shall not have the benefit and protection of its laws in its courts; and that the fruits of the action may not be remitted to a hostile country, and so furnish resources to the enemy. *Hutchinson* v. *Brock*, 11 Mass. 122. *Sparenburgh* v. *Bannatyne*, 1 B. & P. 170. *M' Connell* v. *Hector*, 3 B. & P. 114. The objection has not been much favored; for even in a real action, after the plaintiff has recovered judgment, alien enemy at the time of the original suit is no good plea to *scire facias* to obtain an execution; *West* v. *Sutton*, 2 Ld. Raym. 853; *S. C.* 1 Salk. 2; Holt, 3; and in a personal action brought by an alien friend, his becoming an enemy by the breaking out of war, which could not have been pleaded earlier, has been held no ground for staying judgment after verdict, or execution after judgment, or affirmance of a judgment on error. *Venbrynen* v. *Wilson*, 9 East, 321. *Buckley* v. *Lytle*, 10 Johns. 117. *Owens* v. *Hannay*, 9 Cranch, 180. No answer in the nature of a plea of alien enemy has been filed in this case, and no objection made to the capacity of the plaintiff to sue, but only to the validity of the contract sued on; and therefore no question of the personal disability of the plaintiff is involved, or need be considered, except so far as to show that it is wholly independent of the merits of the cause of action.

In *Potts* v. *Bell*, 8 T. R. 548, the elaborate arguments of the common lawyers and civilians and the judgment of the court were confined to the question of the illegality of a British sub-

ject's trading with an enemy, and the single point decided was that an insurance upon such trading was illegal. In *Antoine* v. *Morshead*, 6 Taunt. 237; *S. C.* 1 Marsh. 558; it was held that a bill of exchange drawn on England by a British subject imprisoned in France, payable to another British subject also imprisoned there, and indorsed to a French banker, during the war, might be sued upon by the latter in England after the return of peace; and Chief Justice Gibbs said: " I can collect but two principles from the cases cited by the counsel for the defendant, and they are principles on which there never was the slightest doubt. First, that a contract made with an alien enemy in time of war, and that of such a nature that it endangers the security or is against the policy of this country, is void; such are policies of insurance to protect an enemy's trade. Another principle is, that however valid a contract originally may be, if the party become an alien enemy he cannot sue; the crown, during the war, may lay hands on the debt, and recover it; but if it do not, then, on the return of peace, the rights of the contracting alien are restored, and he may himself sue. No other principle is to be deduced." In *Willison* v. *Patteson*, 1 Moore, 133; *S. C.* 7 Taunt. 440; a bill of exchange drawn upon a British subject resident in England, and having funds of an enemy in his hands, by an alien enemy residing in the hostile territory, payable to his own order, and by him indorsed to a British subject also residing there, was held void, because a direct trading with the enemy. The recent case of *Esposito* v. *Bowden*, 7 El. & Bl. 763, was upon a charter party for a voyage by a British subject to an enemy's port, which the plea alleged could not be performed without " dealing and trading with the queen's enemies; " and the judgment of the exchequer chamber, as delivered by that excellent commercial lawyer, Mr. Justice Willes, was equally limited, and stated the general proposition upon which the judgment was based in this form: " It is now fully established that, the presumed object of war being as much to cripple the enemy's commerce as to capture his property, a declaration of war imports a prohibition of commercial intercourse and correspondence with the inhabitants of the enemy's country,

and that such intercourse, except with the license of the crown, is illegal."

We now come to the American cases cited for the defendant. The earliest is that of *Hannay* v. *Eve*, 3 Cranch, 242, which merely decided that a contract made in fraud of the laws of the United States could not be enforced in the courts of the United States. In the later case of *Kennett* v. *Chambers*, 14 How. 38, the same principle was applied, and it was held that a contract made in the United States, after Texas had declared itself independent of Mexico, but before its independence had been acknowledged by the United States, to convey lands in Texas, in consideration of money advanced in the United States to enable Texas to carry on war against Mexico, was in contravention of the public policy and treaties of the United States, when it was made, and could not therefore be enforced in their courts, after Texas had been admitted into the Union. To say that the present case falls within the same principle is to beg the whole question in controversy.

In *Thirty Hogsheads of Sugar* v. *Boyle*, 9 Cranch, 191, the only point discussed or adjudged was that produce of territory in the occupation of the enemy must be condemned by a prize court as enemy's property, so long as it belonged to the owner of the soil, whatever his national character or personal domicil. A like rule was held to apply in the recent civil war, in the *Prize Cases*, 2 Black, 635.

In the cases of *The Rapid*, 1 Gallis. 304; *The Julia*, Ib. 601–604; and *The Emulous*, Ib. 571; Mr. Justice Story indeed spoke of the unlawfulness of communications with the enemy as extending to all contracts and every kind of intercourse. But all such statements were *obiter dicta;* for neither of those cases involved so broad an application. In *The Julia*, he admitted, in the circuit court, that "the proposition is usually laid down in more restricted terms by elementary writers, and is confined to commercial intercourse;" and in delivering the judgment of affirmance in the supreme court, he defined the point decided to be " that the sailing on a voyage under the license and passport of protection of the enemy, in furtherance of his views

and interests, constitutes such an act of illegality as subjects the ship and cargo to confiscation as prize of war." 1 Gallis. 601. 8 Cranch, 190. In *The Emulous,* the only question in issue was of the confiscation of enemies' property; and his decree was reversed by the supreme court. *Brown* v. *United States,* 8 Cranch, 110. His decree in *The Rapid* was affirmed. 8 Cranch, 155. But in that case, as well as in *The Joseph,* 1 Gallis. 545, and 8 Cranch, 451, the decision was simply that the sending of a vessel by an American to or from an enemy's port after a declaration of war was a trading with the enemy, which would warrant a condemnation in a prize court.

In delivering the judgment of the supreme court in the case of *The Rapid,* Mr. Justice Johnson said : " In the state of war, nation is known to nation only by their armed exterior; each threatening the other with conquest or annihilation. The individuals who compose the belligerent states exist, as to each other, in a state of utter occlusion. If they meet, it is only in combat." " On the subject which particularly affects this case, there has been no general relaxation. The universal sense of nations has acknowledged the demoralizing effects that would result from the admission of individual intercourse. The whole nation are embarked in one common bottom, and must be reconciled to submit to one common fate. Every individual of the one nation must acknowledge every individual of the other nation as his own enemy, because the enemy of his country." And in speaking of the rule of prize law, which condemns property engaged in hostile trade, "the object, policy and spirit of the rule is to cut off all communication or actual locomotive intercourse between individuals of the belligerent states. Negotiation or contract has therefore no necessary connection with the offence. Intercourse inconsistent with actual hostility is the offence against which the operation of the rule is directed." 8 Cranch, 160–163. These expressions would seem to have been intentionally, as they are necessarily in judicial effect, limited to the case before the court, of actual passage of persons or transmission of property between the territories of the belligerents. In *Scholefield* v. *Eichelberger,* 7 Pet. 586, in which a con-

tract made with an enemy during war for the purchase of goods was held void, the same learned judge, after asserting in the broadest terms, and outside of the question at issue, that " the doctrine is not at this day to be questioned that, during a state of hostility, the citizens of the hostile states are incapable of contracting with each other," took the precaution of adding, " To say that the rule is without exception would be assuming too great a latitude."

The general statements of Mr. Justice Daniel in *Jecker* v. *Montgomery*, 18 How. 110, and Mr. Justice Clifford in *Hanger* v. *Abbott*, 6 Wallace, 532, that as a consequence of the state of war all communication and intercourse between the citizens of one belligerent and those of the other are unlawful, were manifestly but repetitions of earlier *dicta*, without having occasion to scrutinize them with care; for in the first case the vessel and cargo condemned as prize were knowingly sent by a citizen during war to an enemy's port; and in the second the only question was of the suspension of the running of the statute of limitations while the courts were closed during war. *The Ouachita Cotton*, 6 Wallace, 521, was a case of a sale of merchandise, which was strictly an act of commercial intercourse.

In the most recent judgment of the supreme court of the United States upon this subject, delivered since the argument of this case, the general doctrine is thus stated by Mr. Justice Davis : " By a universally recognized principle of public law, commercial intercourse between states at war with each other is interdicted. It needs no special declaration on the part of the sovereign to accomplish this result, for it follows from the nature of war that trading between the belligerents should cease. If commercial intercourse were allowable, it would oftentimes be used as a color for intercourse of an entirely different character; and in such a case the mischievous consequences that would ensue can be readily foreseen. But the rigidity of this rule can be relaxed by the sovereign, and the laws of war so far suspended as to permit trade with the enemy. Each state settles for itself its own policy, and determines whether its true interests are better promoted by granting or withholding licenses

to trade with the enemy." *United States* v. *Lane*, 8 Wallace, 195. See also *McKee* v. *United States*, Ib. 166.

Chancellor Kent, in a most able and learned opinion delivered in the court of errors of New York, and again in his Commentaries, asserted with great positiveness, as a necessary consequence from the doctrine of the illegality of all commercial intercourse and traffic, that all contracts made with the enemy during war were utterly void. *Griswold* v. *Waddington*, 16 Johns. 438. 1 Kent Com. 67. But the case of *Griswold* v. *Waddington*, as the learned chancellor candidly admitted at the outset of his opinion, was a case of commercial intercourse in the strictest sense, a dealing between commercial houses and with commercial paper; and nothing further was brought into judgment, except that a commercial partnership between the citizens of two countries was dissolved by the breaking out of war between them. His more general statements, therefore, in the opinion, like the repetition of them in his Commentaries, have not the weight of an adjudication.

The only authorities, English or American, cited by Mr. Justice Story or Chancellor Kent, which afford any color for extending the doctrine beyond trading directly or indirectly with the enemy, or insurances upon or licenses for such trade, are one ancient order in the Black Book of the Admiralty, two cases in the Year Books, and a dictum in the court of chancery.

The Black Book of the Admiralty contains a direction that "inquisition be taken of all those who intercommunicate (*entrecommunent*), buy or sell with any of the enemies of our lord the king, without special license of the king or of his admiral." It might well be doubted whether *entrecommunent*, in its connection with buying and selling, was intended to include anything but trading or commercial intercourse. But it is sufficient to observe that, as that great legal antiquary, John Selden, tells us, "The book itself is rather a monument of antiquity, yet not above about Hen. VI., than of authority, and rather as a purpose of what was in some failing project, than ever in use and judgment held authentical. Most of it is against both the now received and former practice. Selden's notes to Fortescue, *c.* 32, 3 Selden's Works, 1898.

Chancellor Kent observes, "Brian, J., is made to say in 19 Edw. IV., Bro. Ab. tit. Denizen et Alien, pl. 20, that an obligation made to the enemy of the king is void." But it appears, both in the original Year Book of 19 Edw. IV. 6, pl. 4, and in Chief Justice Brooke's Abridgment, that the obligation sued on was made in the third year of the king; and the plea was that the plaintiff was born in the allegiance of the King of Denmark, who and all his subjects had been enemies since the eighth year of the king — in other words, not that the plaintiff was an enemy at the making of the obligation, but only at the time of bringing suit, that is to say, an ordinary plea of alien enemy, to the disability of the plaintiff, and not to the validity of the contract; the *dictum* of Chief Justice Brian was only that "perhaps the obligation would be void against the party, but the king should have it;" and even of this Chief Justice Brooke added in the place cited, and also in pl. 16 of the same title, *quære;* and Chancellor Kent himself, when chief justice of the supreme court of New York, said: "The doctrine once held in the English courts, that an alien's bond became forfeited by the war (Year Book 19 Edw. IV. pl. 6) would not now be endured. The plea is called in the books an odious plea, and the latter cases concur in the opinion that the ancient severities of war have been greatly and justly softened by modern usages, the result of commerce and civilization." *Clarke* v. *Morey,* 10 Johns. 71, 72. The authority of the *dictum* as evidence of the law of nations at this day may be weighed by the ruling in the same court a few years earlier, (also referred to by Chancellor Kent in *Griswold* v. *Waddington,*) that "all men may seize such goods as enemies of the king bring into the kingdom, and hold the goods to their own proper use." 7 Edw. IV. 13, 14, pl. 5. Bro. Ab. Property, 38. It is hardly necessary to remark that, by our law, enemies' goods on land within our territory cannot be seized by private citizens to their own use, nor even by the gov ernment, without an act of congress. *Brown* v. *United States* 8 Cranch, 110. *Alexander's Cotton,* 2 Wallace, 404.

In *Ex parte Boussmaker,* 13 Ves. 71, upon an application by an alien enemy to prove a debt in bankruptcy, Lord Erskine did

say, " If this had been a debt arising from a contract with an alien enemy, it could not possibly stand; for the contract would be void." But the nature of the debt does not appear by the report; and this *dictum* was wholly extrajudicial; for the contract was made before the war, and the debt was allowed to be proved, reserving the dividend.

The continental writers, cited by Chancellor Kent, fall far short of supporting his assertion that they " unitedly prove that all private communication and commerce with an enemy in time of war are unlawful." Judge Story, as we have already seen, in the case of *The Julia*, 1 Gallis. 601, acknowledged that they usually confined the prohibition to commercial intercourse; and hardly any of them, even as quoted by Chancellor Kent, go beyond that. The strongest, according to his statement, would appear to be Grotius, Cleirac and Valin. But Grotius, in the place relied on, by no means " says expressly that private contracts with the enemy touching private actions and things are unlawful, and controlled by the duty which the citizen owes to his own state." At the utmost, he leaves it an open question; for his words are: *Sed de ipsorum actionibus et rebus quæri potest, quia videmus hæc quoque concedi hostibus non posse sine aliquo damno partis; unde videri possunt talia pacta illicita cum civibus ob jus supereminens civitatis;* and again: *Lex quidem posset adimere subditis aut perpetuis aut temporariis hanc potestatem; sed neque lex hoc semper facit, parcit enim civibus, &c.* De Jure Belli, lib. 3, *c.* 23, art. 5. And the positions of Cleirac and Valin are apparently founded not upon the general law of nations, but upon particular ordinances of France. Cleirac, 197. 2 Valin, 31, 253.

On the other hand, in the case of *Coolidge* v. *Inglee*, 13 Mass. 26, which was an action on a promissory note given by one American citizen to another in consideration of the sale to him of a British license, Mr. Justice Jackson, delivering the unanimous judgment of this court, after deliberate advisement, and speaking of the argument that all intercourse with an enemy is unlawful, said: " This general proposition cannot be maintained, in the unlimited extent to which it has been carried in

the argument for the defendant. Commercial intercourse between two nations at war is understood to be prohibited. This interdiction applies, in general, to any species of commerce by which the enemy may be benefited at the expense of our own country. But the books of the highest authority on the law of nations, and the usages of all civilized people in modern times, abundantly prove that intercourse is not universally prohibited, and that even contracts with an enemy are in some cases allowable." And after carefully examining in detail the statements of the text writers, expressing the belief that " the prohibition is confined, among all civilized nations in modern times, to such intercourse as is commercial," and " dismissing this idea of something mysteriously noxious and criminal in every kind of intercourse with an enemy," he proceeds to the consideration of the question whether the contract sued on was lawful, and arrives at the result that it was. That decision was indeed overruled by the supreme court of the United States in *Patton* v. *Nicholson*, 3 Wheat. 204, on the ground that the use of such a license by a citizen was unlawful. But this only shows that the general principle was misapplied in *Coolidge* v. *Inglee*, not that it was unsound or inaccurately stated. The wrong application of a principle does not weaken either the principle itself or the obligation of courts to adhere to it. *Capen* v. *Barrows*, 1 Gray, 380. That a citizen could not, consistently with a state of hostility and with his duty to his own country, take or use a license from the public officers of the enemy, does not affect the extent of the right of communication or contract between private citizens. *Musson* v. *Fales*, 16 Mass. 332, was a case of trading or commercial intercourse, which was held not to be so unlawful as to be no foundation for an action at law by a party who did not know that the party with whom he dealt was an enemy; and exhibits no intention to modify the statement of the general doctrine in *Coolidge* v. *Inglee*.

The result is, that the law of nations, as judicially declared prohibits all intercourse between citizens of the two belligerents which is inconsistent with the state of war between their countries; and that this includes any act of voluntary submission to

**the** enemy, or receiving his protection ; as well any act or con·
tract which tends to increase his resources ; and every kind of
trading or commercial dealing or intercourse, whether by trans-
mission of money or goods, or orders for the delivery of either,
between the two countries, directly or indirectly, or through the
intervention of third persons or partnerships, or by contracts in
any form looking to or involving such transmission, or by insur-
ances upon trade with or by the enemy.    Beyond the principle
of these cases the prohibition has not been carried by judicial
decision.    The more sweeping statements in the text books are
taken from the *dicta* which we have already examined, and in
none of them is any other example given than those just men-
tioned.    At this age of the world, when all the tendencies of
the law of nations are to exempt individuals and private con-
tracts from injury or restraint in consequence of war between
their governments, we are not disposed to declare such contracts
unlawful as have not been heretofore adjudged to be inconsist-
ent with a state of war.

The trading or transmission of property or money which is
prohibited by international law is from or to one of the coun-
tries at war.    An alien enemy residing in this country may con-
tract and sue like a citizen.  2 Kent Com. 63.    When a cred·
itor, although a subject of the enemy, remains in the country of
the debtor, or has a known agent there authorized to receive the
amount of the debt, throughout the war, payment there to such
creditor or his agent can in no respect be construed into a vio-
lation of the duties imposed by a state of war upon the debtor ;
it is not made to an enemy, in contemplation of international
or municipal law ; and it is no objection that the agent may
possibly remit the money to his principal in the enemy's coun-
try ; if he should do so, the offence would be imputable to him,
and not to the person paying him the money.    *Conn* v. *Penn,*
Pet. C. C. 496.  *Denniston* v. *Imbrie,* 3 Wash. C. C. 396.   *Ward·*
v. *Smith,* 7 Wallace, 447.   *Buchanan* v. *Curry,* 19 Johns. 137.
The same reasons cover an agreement made in the enemy's
territory to pay money there out of funds accruing there and
not agreed to be transmitted from within our own territory ; for,

as was said by the supreme court of New York in the case last cited, " the rule is founded in public policy, which forbids, during war, that money or other resources shall be transferred so as to aid or strengthen our enemies. The crime consists in exporting the money or property, or placing it in the power of the enemy."

Public international law, being the rule which governs the intercourse of one nation and its subjects with other nations and their subjects, is ordinarily limited, so far as rights of property and contracts are concerned, to movable, or, in the phrase of the common law, personal property, which is in its nature capable of being carried or transmitted from one country to the other; and does not usually touch private interests in immovable property or real estate; although any government may doubtless, by express law or edict, appropriate or confiscate for its own benefit the use, the profits, or even the title, of land within its own territory or occupation, belonging to subjects of the enemy. 3 Phillimore's International Law, 135, 731. *Reed* v. *Reed*, 1 Munf. 619. *Smith* v. *Maryland*, 6 Cranch, 286. *Fairfax* v. *Hunter*, 7 Cranch, 622, 623, 631. *Union Insurance Co.* v. *United States*, 6 Wallace, 759. The title of aliens in real estate is usually left to be regulated by the municipal law, and, under our system of government, by the laws of the several states, except so far as controlled by treaties with foreign powers. *Chirac* v. *Chirac*, 2 Wheat. 259. *Spratt* v. *Spratt*, 1 Pet. 343; *S. C.* 4 Pet. 393. *Bonaparte* v. *Camden & Amboy Railroad Co.* Bald. 205. *Montgomery* v. *Dorion*, 7 N. H. 475. 2 Kent Com. 70, 71.

By the common law, as declared by the American courts, an alien may take land by purchase, either by grant or by devise, and hold or convey the title, or in time of peace recover it by suit, subject in either case to be devested by inquest of office. *Fairfax* v. *Hunter*, 7 Cranch, 603. *Craig* v. *Radford*, 3 Wheat. 594. *Doe* v. *Robertson*, 11 Wheat. 332. *Sheaffe* v. *O'Neil*, 1 Mass. 256. *Fox* v. *Southack*, 12 Mass. 143. *Wilbur* v. *Tobey* 16 Pick. 179, 180. *Waugh* v. *Riley*, 8 Met. 290. 2 Kent Com. 61. It would seem to be a necessary corollary from this, and

such is the better opinion, that he may, unless restrained by statute, take and hold a lease of real estate, at least until office found. Co. Lit. 2 *b*, and Hargrave's notes. 2 Kent Com. 61, 62.

In regard to real estate, there is no difference between an alien friend and an alien enemy, except that the latter cannot maintain an action to recover it while the war lasts, and that it may be confiscated by an extraordinary act of the government. In the great case of *Hunter* v. *Fairfax*, 1 Munf. 218, and 7 Cranch, 603, better known as *Martin* v. *Hunter*, 1 Wheat. 304, the highest courts of Virginia and of the United States, though they differed upon the questions whether the latter had jurisdiction of the case, and whether there had been proceedings equivalent to an inquest of office, were in accord upon this point; and it was admitted in the court of appeals of Virginia, and adjudged by the supreme court of the United States, that a British subject, being an alien enemy, could take lands by devise from a citizen during the Revolutionary War. In the court of appeals, Judge Fleming said : " I believe it is not, or ought not, to be controverted at this day, that an alien may take land within the Commonwealth by purchase, as well by devise as by grant or other conveyance, and hold the same until something further be done to devest him of his right, to wit, office found." 1 Munf. 233. And Judge Roane said : " The right of the Commonwealth to lands purchased by an alien is an ordinary right derived from the common law. It exists at all times. It is independent of, and does not arise out of a state of war." " It results from a mere municipal regulation. It accrues not because the person purchasing is an enemy, but because he is an alien. It is not a right pointed against the subjects of a particular power with whom we may chance to be at war, but against the subjects of all foreign nations whatsoever." ·Ib. 226, 618. Mr. Justice Story, in delivering the opinion of the majority of the supreme court of the United States, stated the law upon this point thus : " It is clear by the common law, that an alien can take lands by purchase, though not by descent; or, in other words, he cannot take by the act of law, but he may by the act of the party

This principle has been settled in the Year Books, and has been uniformly recognized as sound law from that time. Nor is there any distinction, whether the purchase be by grant or devise. In either case, the estate vests in the alien; not for his own benefit, but for the benefit of the state; or, in the language of the ancient law, the alien has the capacity to take, but not to hold lands, and they may be seized into the hands of the sovereign. But until the lands are so seized, the alien has complete dominion over the same." " We do not find that, in respect to these general rights and disabilities, there is any admitted difference between alien friends and alien enemies. During the war, the property of alien enemies is subject to confiscation *jure belli*, and their civil capacity to sue is suspended. But as to capacity to purchase, no case has been cited in which it has been denied." " Indeed, the common law in these particulars seems to coincide with the *jus gentium.*" 7 Cranch, 619, 620. Mr. Justice Johnson agreed with the rest of the court upon this question, and said, " The disability of an alien to hold real estate is the result of a general principle of the common law, and was in no wise attached to the individual on account of his conduct in the Revolutionary struggle." Ib. 628 *et seq.* And the doctrine that an alien enemy might acquire title in lands by purchase during the war was again distinctly recognized and affirmed in *Craig* v. *Radford,* 3 Wheat. 594. See also *Jackson* v. *Clarke*, Ib. 1, and note; *Stephen* v. *Swann*, 9 Leigh, 414, 415; *Yeo* v. *Mercereau*, 3 Harrison, 397.

In a civil war, it is well settled that the sovereign has belligerent as well as sovereign rights against his rebel subjects, and may exercise either at his discretion. *Rose* v. *Himely*, 4 Cranch 272. *The Amy Warwick*, 2 Sprague, 123; *S. C. and other Prize Cases*, 2 Black, 635. *Alexander's Cotton*, 2 Wallace, 419. The act of congress and the proclamations of the President upon which the defendant relies in this case are in terms limited to the prohibition of commercial intercourse and the conveyance or transmission of goods and merchandise between the territories occupied by the two belligerents; and thus clearly manifest the intention of the government, in accordance with what we have

seen to be the general law of nations, that commercial intercourse, and commercial intercourse only, should be prohibited. They clearly do not extend to agreements made in the enemy's territory between two persons being there, for the leasing of real estate therein, the payment of rent there out of the products of the land, or the delivery of and payment for personal property already upon the demised premises and to be used thereon. The scope and meaning of the words may be illustrated by referring to the equivalent words in that article of the Constitution which confers upon congress " power to regulate commerce with foreign nations, and among the several states," which describe, as Chief Justice Marshall says, " the commercial intercourse between nations and parts of nations, in all its branches," and " every species of commercial intercourse between the United States and foreign nations." *Gibbons* v. *Ogden*, 9 Wheat. 190, 193. No one would contend that congress, under the power to regulate commerce, could legislate about conveyances or leases of land or the transfer of money or personal property within a state.

The lease now in question was made within the rebel territory, where both parties were at the time, and would seem to have contemplated the continued residence of the lessee upon the demised premises throughout the term ; the rent was in part paid on the spot, and the residue, now sued for, was to be paid out of the produce of the land ; and the corn, the value of which is sought to be recovered in this action, was delivered and used thereon. No agreement appears to have been made as part of or contemporaneously with the lease, that the cotton crop should be transported, or the rent sent back, across the line between the belligerents; and no contract or communication appears to have been made across that line, relating to the lease, the delivery of possession of the premises or of the corn, or the payment of the rent of the one or the value of the other. The subsequent forwarding of the cotton by the defendant's son from Mississippi to Massachusetts may have been unlawful; but that cannot affect the validity of the agreements contained in the lease. Neither of these agreements involved or contemplated the trans-

mission of money or property, or other communication, between the enemy's territory and our own. We are therefore unanimously of opinion that they did not contravene the law of nations or the public acts of the government, even if the plantation was within the enemy's lines; and that the plaintiff, upon the case reported, is entitled to recover the unpaid rent, and the value of the corn.

We need not, therefore, consider the questions, argued at the bar, upon the effect of the military occupation of a portion of the state of Mississippi by the national forces, or of the license to the plaintiff from the military commander.

*Judgment for the plaintiff; case referred to an assessor.*

*H. C. Hutchins & A. S. Wheeler*, for the defendant, besides some of the cases cited in the opinion, cited Halleck on Intern. Law, 357, 358, 496, 497; 1 Phillim. Intern. Law, 111; Manning's Law of Nations, 122, 123; Wheat. Intern. Law (8th ed.) § 317; Duponceau's Law of War, 55, 56; 2 Wildman on Intern. Law, 8, 9; 1 Duer on Ins. 556–559; *Ship Francis*, 1 Gallis. 448; *United States* v. *One Hundred & Twenty-nine Packages*, 2 Am. Law Reg. (N. S.) 419; *Allen* v. *Russell*, 3 Am. Law Reg. (N. S.) 361; *Norris* v. *Doniphan*, Ib. 471; *United States* v. *One Hundred Barrels of Cement*, Ib. 735; *Connecticut Insurance Co.* v. *Hall*, 7 Am. Law Reg. (N. S.) 606; *Cuyler* v. *Ferrill*, 8 Am. Law Reg. (N. S.) 100; *Billgery* v. *Branch*, Ib. 334.

*R. M. Morse, Jr. & F. V. Balch*, for the plaintiff.

---

## MEMORANDUM.

On the twelfth day of January 1869, the Honorable DWIGHT FOSTER resigned the office of justice of this court, which he had held since the thirty-first day of August 1866.