COMPAGNIE UNIVERSELLE DE TELEGRAPHIE ET DE TELEPHONIE SANS FIL

*v.*

UNITED STATES SERVICE CORPORATION et al.

[Decided August 2d, 1915.]

1. Contracts entered into before the beginning of hostilities continue in force during the war, and may be sued upon if to the disadvantage of the alien enemy defendant, who may always defend and who may in exceptional cases sue.

2. A French company and a German company entered into a contract before the beginning of hostilities between their respective governments, whereby the German company conveyed certain wireless telegraph patent rights, undertook to construct a wireless station in New Jersey, and, on failure to meet the prescribed conditions as to its operation, agreed to repurchase it. After the beginning of hostilities, a law and ordinance of the French republic forbade French citizens from performing existing contracts for the benefit of alien enemies, a statute of the German empire forbade all German subjects from carrying on any business with French citizens, and a special military decree forbade the German company to render any assistance to the French company or to initiate any action against it. The German penal code, paragraph 89, enacts that a German doing anything to assist a hostile power shall be punished for high treason. The New Jersey statutes give aliens the same rights to acquire, hold, and dispose of lands as citizens, and Chancery act (*Comp. Stat. 1910 p. 426 § 45*) declares that a decree for a conveyance, &c., not complied with by the party against whom it passes, shall be as effective as if executed conformably to the decree, notwithstanding any disability of such party.—*Held*, on a bill by the French company for specific performance of the contract to repurchase, that a plea that it would be unlawful for the parties to perform a decree was not good, that neither the French ordinance nor the German statute or decree expressly forbade the institution of a suit or its defence, that the ground of aid to an alien enemy failed, that comity required that a neutral court be open to litigation by either party to the contract, and that if compliance with the decree was refused the Chancery act would enforce it.

*Mr. John R. Hardin* and *Mr. George Zabriskie,* for the complainant.

*Mr. Robert H. McCarter* and *Mr. Samuel Untermyer,* for the defendants.

STEVENS, V. C.

The bill is filed to compel the specific performance of a contract to convey (*inter alia*) land at Tuckerton, New Jersey, on which has been erected a radio-telegraph station.

The contract, which bears date September 30th, 1912, is made between Retired Rear Admiral Hugo Emsmann and Professor Doctor Engineer Rudolph Goldschmidt, acting as directors of the Hoch Frequenz-Machinen Aktiengesellschaft für Drahtlose Telegraphie, of Berlin, Germany, and M. Jean Bourdelongue and M. Ernest Sins, acting for Compagnie Universelle de Telegraphie et

606 CASES IN CHANCERY, 1915.

Compagnie Universelle, &c.. *v.* U. S. Serv. Corp. *84 N. J. Eq.*

de Telephonie Sans Fil, of Paris, France. It was entered into at Paris, and, speaking generally, it was agreed between the Prussian company, under the abbreviated name of "Homag," and the French company, under the abbreviated designation "C. U. T. T.," that the German company conveys (in the present tense) certain patents of invention taken out or applied for in the United States, England, Austria, Belgium, Canada, Denmark, France, Italy, Russia, Sweden, Spain and Brazil, for the production of high frequency currents specially intended for wireless telegraphy and, under reservations, certain patents taken out or applied for in Germany.

Also,

"the benefit of the studies, researches, proceedings, agreements, acquisitions and work (acquisitions et travaux) done by the Homag, under its name or under any name whatever, with a view to the promotion or exploitation of a radio telegraphic station in the United States of America."

Also certain other rights not very material to the present inquiry.

Article 2 provides "that the sale takes place in consideration of 2,500,000 francs," which has been actually paid, and fifty thousand founders' shares of the French company which have been duly delivered; and article 3 provides that the French company "shall have the full right and enjoyment of the property and rights sold from this day on."

The article which specially concerns the present inquiry is article 7. It provides for the installation of a radio-telegraph station in the United States. It reads in part:

"It is expressly agreed that the work of construction and installation of said station shall be carried on and directed by the 'Homag,' acting in the name and for the account of the 'C. U. T. T.' under its supervision and control. * * * It is well understood, however, that the 'Homag' cannot obligate the 'C. U. T. T.' for a total of the expenditures made or incurred relative to this station to a sum greater than 2,000,000 francs except by agreement with the 'C. U. T. T.' The 'C. U. T. T.' shall have the right at all times to itself take over the direction of the work."

There is another clause providing that if in nine months after the completion of the installation

"communication between the United States of America and Europe by the transmission of three thousand words in twenty-four consecutive hours shall not have been realized, both parties being present, the 'C. U. T. T.' shall have the right to require that the 'Homag' shall *re-purchase* this radio telegraphic station from it at the cost price."

The bill, after setting forth the contract and the payment of the consideration, viz., 2,500,000 francs and fifty thousand founders' shares in the French company, alleges that since its execution the patents which it was recited in the contract had been applied for, and certain other patents, in the United States, have been issued to the defendant Goldschmidt, in the United States, and are being used in the Tuckerton station; and that the work of construction at Tuckerton has been completed and that the defendant Meyer has been put in possession.

The absent defendants were brought in by order of publication. They have all appeared. The United States Service Corporation and Meyer have filed disclaimers, and the defendants Homag and Goldschmit have filed a plea. The case comes up on the sufficiency of this plea.

It states, first, that the Tuckerton station communicates, and can communicate, only with the Prussian station at Eilwese, and that to give the French company present possession would be to close it and prevent Germany, among other things, from communicating directly with the United States. But this objection seems to be met by the further statement in the plea that the navy department of the United States, pursuant to an act of congress, entitled "An act to regulate radio communication," on September 9th, 1914, assumed exclusive control of the station, which is being operated under the supervision of a naval officer in charge thereof, and that all tolls for messages are being collected by the government of the United States, which holds the same in trust.

Assuming (without deciding) that this court would not, during the continuance of the war, compel a specific performance of the agreement because its effect would be to cut off direct communication with the German empire, it is obvious that in view of the control assumed by the United States government no such result would follow. I, therefore, dismiss this part of the plea from further consideration.

The substance of the remainder of the plea is that this court ought not *now* to entertain the suit because it would be unlawful, according to the laws of their respective countries, for the subjects or citizens of Germany or France to perform the decree if made.

On this, there is this observation: It is one thing to decline jurisdiction and turn the parties out of court altogether, and quite another to stay the trial, if a fair trial cannot be had, because of the absence of material witnesses or for other reasons.

The question now to be considered is whether the court should dismiss the bill.

At the outset of the discussion it is to be remembered that the suit has been instituted in the court of a neutral and not in the court of a belligerent. Reasons that would suffice to suspend the right of action in the latter may not be applicable in the former.

The cases cited have been those arising in the courts of one of the belligerents. They are numerous, and their result, as far as they bear upon the present controversy, has been thus summed up by Judge Veeder in the very recent case of *Watts, Watts & Co. v. Uneone Austriciaca di Navigazione, 224 Fed. Rep. 188*, in the United States district court. He says: "The law of nations, as judicially declared, prohibits all intercourse between citizens of the belligerents which is inconsistent with the state of war between their countries. No transaction injurious to their own government may be entered into or continued by them. Ordinary commercial intercourse is therefore incompatible with a state of war, since every act and contract which tends to increase the enemies' resources is absolutely interdicted, and this includes every kind of trading or commercial dealing, whether by transmission of money or goods, or order for the delivery of either, directly or indirectly, or by contracts in any form looking to or involving such transmission. Every such contract made during war is illegal and void. Since, however, *aid to the enemy is the touchstone of illegality,* discrimination is permitted in the case of contracts made before the outbreak of war. Further performance which enures to the aid of or involves any dealing with the enemy is illegal. If from its character the contract is incapable of suspension it is dissolved. But where such interruption of

CASES IN CHANCERY, 1915. 609

84 N. J. Eq.  Compagnie Universelle, &c., v. U. S. Serv. Corp.

performance does not go to the root of the transaction, the contract is merely suspended during the war. The alien enemy is not *civiliter mortuus;* he is merely in a state of suspended animation. When the war ends the mutual obligations of performance and right of action revive. Where, therefore, such a contract has been entered into with an alien enemy before the outbreak of war and has been performed on his side, the war merely suspends his remedy; in other words, he cannot sue upon it during the existence of hostilities. If, on the other hand, performance of the contract is on the side of the other party, he can enforce the contract (particularly such as require for performance payment of money only) in the courts of his own country during the continuance of war, provided, of course, a cause of action has accrued. The reason why the rule debarring action on the part of an alien enemy plaintiff can have no application where the parties are reversed is plain. The rule is based upon the obvious ground that it is contrary to public policy for the courts of a belligerent country to render any assistance to an alien enemy to enforce rights, which, but for the war, he would be entitled to enforce to his own advantage and to the detriment of his opponent. It is apparent, therefore, that to hold that a subject's right of action against an alien enemy in his own country is suspended, would be to defeat the very object of the suspensory rule and to turn a disability into a relief." The following, among others, are leading cases on the subject: *Mutual Benefit Life Insurance Co.* v. *Hillyard, 37 N. J. Law 444; Kershaw* v. *Kelsey, 100 Mass. 561; Esposito* v. *Bowden, 7 El. & Bl. 763; Jansen* v. *Driefontein Consolidated Mines (1902), A. C. 484; Briggs* v. *United States, 143 U. S. 346; Williams* v. *Paine, 169 U. S. 55.*

From the opinion of Judge Veeder it is apparent that in the case of executed contracts—that is, contracts, like the one under consideration, performed on one side—suspension of the remedy, even in a belligerent court, is not absolute. Such contracts will be enforced where it is to the advantage of the belligerent to enforce them. But this is by no means all. It was held *In re Boussmaker, 13 Ves. 71,* that in cases of bankruptcy, an alien enemy's claim against the bankrupt can be proved, but that the

39

610    CASES IN CHANCERY, 1915.

Compagnie Universelle, &c., *v.* U. S. Serv. Corp.    *84 N. J. Eq.*

dividend will be reserved until the close of the war. In *McVeigh* v. *United States, 11 Wall. 267,* it was held that an alien enemy can defend a suit brought against him. As far back as the time of William III., it was decided that if an alien enemy came into the kingdom, *sub salvo conductu,* he might maintain an action; for, said the court, "suing is but a consequential right of protection, and therefore an alien enemy that is here in peace, under protection, may sue a bond." Trotter, in his work on *"Contract During War,"* page 951, says:

"The general rule is that an action cannot, during war, be brought by or on behalf of an alien enemy unless by virtue of a statute, or by an order in council, or a proclamation, or a license from the crown, or unless he comes into the British dominions under a flag of truce, a cartel, a pass or some other public authority that puts him in the King's peace *pro hac vice."*

In *Casseres* v. *Bell, 8 T. R. 166,* Lord Kenyon said that the plea of alien enemy was an odious one, and in *Kershaw* v. *Kelsey, 100 Mass. 561,* where it was held that payment to the agent of an alien enemy was good, Mr. Justice Gray said: "At this age of the world when all the tendencies of the law of nations are to exempt individuals and private contracts from injury or restraints in consequence of war between their governments, we are not disposed to declare such contracts unlawful as have not been heretofore adjudged to be inconsistent with a state of war."

These citations demonstrate that even in the view of the belligerents themselves, contracts entered into before the beginning of hostilities continue in force during the war; that they may be sued upon, if to the disadvantage of the alien enemy defendant; that the alien enemy may always defend and that he may, in exceptional cases, sue. Is it possible that the courts of a neutral would refuse jurisdiction where enemy courts would entertain it? It is said, in the opinion of Judge Veeder *(supra),* that there is no authority bearing upon the question of the standing of belligerents in the court of a neutral where those belligerents are forbidden by the laws of their respective companies to have dealings with each other. This may have arisen from the fact that no suit by the subject of one belligerent nation domi-

ciled abroad has ever been brought against the subject of another
in the court of a neutral—a supposition somewhat improbable—
or from the fact that the question has not been raised, because
it has been the professional opinion that inasmuch as the laws
of foreign countries have no extra-territorial force, the courts of
neutrals are as completely open to suitors whose governments
are at war with each other as to other litigants. If the only
ground upon which the courts of a belligerent are shut against
its alien enemy, is possible advantage that might accrue to him,
this ground fails entirely when the courts of a neutral are ap-
pealed to. The neutral nation is the friend of both belligerents
and comity requires that the doors of its courts be open, if their
subjects have wrongs to be righted. On what ground, then, are
they, in the case in hand, to be closed? Certainly not on the
plea of alien enemy.

The present controversy concerns title to land in New Jersey.
This is a subject over which the New Jersey courts have almost
exclusive control. In no other jurisdiction can complete relief
be afforded—relief that will operate on the land itself and not
merely on the person of the title holder. Defendants' counsel
rely upon a class of cases in which it is held that the court, in
the exercise of a sound discretion, may refuse to entertain juris-
diction of a controversy between aliens. These are cases of tort
occurring on the high seas or elsewhere outside of the jurisdic-
tion, or cases of contract made and to be performed abroad. If
the court be of opinion that justice can better be administered
in the courts of the domicile of the suitors, it requires them to go
there. They are not authorities for the proposition that the
court may refuse to try title to land lying within its jurisdic-
tion if the suitors be aliens. The laws governing real estate are
best understood here. The subject-matter of the controversy is
here and the transfer of the title takes effect here. Under our
statute aliens have the same right to acquire, hold and dispose
of land as citizens have, and to give effect to this right they must
have the same remedies.

Now, what are the grounds alleged in the plea upon which
this court is asked to refuse to exercise its jurisdiction in favor
of complainant? It first sets out *verbatim* section 2 of the law

of 5th August, 1914, of the Republic of France. This section reads as follows:

> "During the mobilization and until the end of the military operations, the government is authorized to promulgate in the Council of Ministers any such ordinances as will be required in order to make provision to facilitate the performance of civil or commercial contracts, or to make them, temporarily, inoperative. \* \* \*"

The council of ministers promulgated an ordinance as follows:

> "All business and other transactions with subjects of the German and Austro-Hungarian empires or persons residing therein are forbidden. Any agreement made or contract executed in French territory or French protectorate territory by any person, or anywhere by French subjects or subjects of a French protectorate, with subjects of the German and Austro-Hungarian empires or persons residing therein is void."
>
> "During the same period, the performance of any pecuniary or other obligation *for the benefit* of a subject of the German or Austro-Hungarian empires or any person resident therein, from any contract made in French territory, by any person or anywhere by French subjects on or before the above dates, is forbidden and void."

This ordinance does no more than codify the law on the subject as it is stated to be in Judge Veeder's opinion. The first paragraph has, in express words, reference only to transactions and agreements had or made subsequent to August 4th, 1914. The second paragraph forbids performance of past obligations *for the benefit* of subjects of the German or Austro-Hungarian empires. Neither section forbids the bringing of a suit for the *benefit* of a French subject in a French court. It would be strange, indeed, if it should be construed as forbidding a French subject to bring a suit beneficial to himself in the courts of a neutral; especially in view of the general principle of law that denies it extra-territorial force. *"Extra territorium jus dicenti impune non paretur"* is, says Story, the doctrine of the Digest, and it is equally as true in relation to nations as the Roman law held it to be in relation to magistrates. *Conflict of Laws* § 7.

The plea then goes on to refer to, without quoting, a statute of the Empire of Germany, enacted September 30th, 1914, by which, it is averred,

"all German subjects were forbidden to make any payments, directly or indirectly, in money, drafts, checks, transfer of credits or in any other manner, or to transfer any property to or to carry on any dealings or transactions with residents in or subjects or citizens of (*inter alios*) France, the French colonies and the countries of the French protectorate."

It is obvious that there is nothing here which forbids a German subject from defending a suit brought against him in the court of a neutral. Indeed, taken in connection with paragraph 89 of the penal code, which the pleader next quotes *in extenso,* it would rather seem the duty of the German subject to defend; for the enactment is that "a German who during a war declared against the German empire does anything to assist a hostile power   *   *   *   will be punished because of high treason *   *   *.*" To allow such a suit as the present to go by default—if there be a just defence to it—would certainly come within the spirit, if not the letter, of the enactment.

But it seems from the plea that the military governor, whose jurisdiction includes Berlin, the place of domicile of the German company, has issued to that company, specially, a decree that

"during the state of war, you [the German company] are hereafter prohibited to make any payment or render any assistance of any kind at all to   *   *   *   [the French company] or their representatives as well as to *initiate* any move or action *vis-a-vis* of the C. U. T. T. [the French company] or their representatives."

This decree is no doubt operative upon the German company within the limits of the military governor's jurisdiction, but, like any foreign law (if it have the force of law), cannot operate here—cannot prevent this court from vindicating and protecting any right to New Jersey land that may be justly insisted upon. But, like the above-mentioned German statute, it does not, in terms or otherwise, forbid the German company from making a defence. The company is prohibited from making payment to the French company; from assisting it; from "initiating" any move against it. By merely defending itself against a French claim, it will not do any of these forbidden things.

But, it is argued, the court may possibly decree that the German company transfer the land to the French, and then if it

obeys, it will render itself liable to the prescribed punishment. It seems to me there are two answers to this contention. In the first place, bearing in mind the quotation from the Digest given above, which no doubt expresses the law of every civilized country, it can hardly be assumed that it was the purpose of the German legislator to attempt to give extra-territorial force to its enactments or decrees respecting lands in foreign countries, or to put its subjects in the position of refusing to obey orders or decrees respecting those lands made by the courts of the country where those lands lie. But, assuming that obedience to or active compliance with such an order would be held criminal in Germany, and would subject the company to punishment, it could avoid punishment by defending, and then, if unsuccessful, by failing or refusing to comply with the decree. In this situation our statute would operate of its own inherent force.

Section 45 of the Chancery act (*Comp. Stat. p. 426*) provides as follows:

"Where a decree of the court of chancery shall be made for a conveyance, release or acquittance of lands or any interest therein, and the party against whom the said decree shall pass, shall not comply therewith by the time appointed, then such decree shall be considered and taken, in all courts of law and equity, to have the same operation and effect, and be available as if the conveyance, release, or acquittance had been executed conformably to such decree, and this, notwithstanding any disability of such party by infancy, lunacy, coverture or otherwise."

Judge Veeder dismissed the suit brought by Watts & Co. He seems to have treated it as one in which exercise of jurisdiction was discretionary, the parties, the contract and the attached vessel being all foreign. He seems to have thought that the pendency of the war and the laws and ordinances promulgated by the belligerents were good reasons for declining jurisdiction. Whether they were or not—and they do not seem to be very obviously so—the case is no authority for the proposition that this court should refuse to entertain a question of title to land in New Jersey. The very ground upon which it is held that the jurisdiction is discretionary, viz., that there is a more appropriate tribunal elsewhere, here fails, or rather is a reason for

holding it. There is, as I have said, no tribunal as capable of doing complete justice in a case situate like this, as the New Jersey tribunal, and at this time there is no other tribunal anywhere clothed with power to do justice to the extent of its ability by acting upon the person of the defendants that is open to the parties. Besides, I have never supposed that the jurisdiction of the New Jersey courts over land stood upon the same footing with that exercisable over torts committed by aliens on the high seas, in foreign vessels.

To sum up. In times of peace, the courts take jurisdiction, as a matter of course, for the benefit of denizens and aliens alike. If foreign nations are at war among themselves, this nation does not cease to be friendly. Its courts remain open to their subjects. Certainly, a French citizen may still sue an American citizen. Why should he not sue a German subject? No law of France prohibits it. On the contrary, he may sue even in France, if to his advantage and not to the advantage of his enemy. Why may he not sue in this court? If he may not, it can only be on the ground that this court will give *some* effect to German legislation enacted as a war measure—as a means of crippling its enemy. As I have already shown, there is nothing in this legislation, disclosed, at least, by the plea, that prohibits the German subject from defending against a French claim. But suppose there were. If this court gave effect to it, it would, in a measure, be enforcing German law, which, on well-settled principles, can have no extra-territorial operation, to the detriment of the French citizen asking to be heard. This, it seems to me, would be an unneutral act. I, therefore, think that the plea should be overruled, and that the defendants who have not disclaimed should answer.